EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Cooperativa de Consumidores del Noroeste, Inc. y otros<br><br>    Demandantes-Peticionarios<br><br>v.<br><br>Wal Mart Stores, Inc. y otros<br><br>    Demandados-Recurridos | Certiorari<br><br>2003 TSPR 102<br><br>159 DPR \_\_\_\_ |

Número del Caso: CC-2002-944

Fecha: 12 de junio de 2003

Tribunal de Circuito de Apelaciones:
          Circuito Regional I

Juez Ponente:
          Hon. Charles A. Cordero Peña

Abogados de la Parte Peticionaria:
          Lcdo. Néstor M. Méndez Gómez
          Lcdo. Herman G. Colberg Guerra
          Lcda. Heidi L. Rodríguez
          Lcda. María D. Bertólez Elvira
          Lcdo. Jorge E. Pérez Díaz

Abogados de la Parte Recurrida:
          Lcdo. Rubén T. Nigaglioni
          Lcdo. Raúl Arias
          Lcda. Verónica Ferraiouli
          Lcdo. Luis A. Avilés
          Lcdo. Rubén Colón Morales
          Lcdo. José J. Torres Escalera

Materia: Injunction Preliminar y Permanente, Violación de la Ley de
          Monopolios y Restricción de Comercio de P.R. y Daños y
          Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Cooperativa de Consumidores
del Noroeste, Inc. y otros

    Demandantes Peticionarios

        v.                               CC-2002-944

Wal Mart Stores, Inc. y otros

    Demandados Recurridos

RESOLUCIÓN

San Juan, Puerto Rico a 12 de junio de 2003

     Se deniega la solicitud de certiorari presentada en esta etapa de los procedimientos.

     Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Naveira de Rodón emitió un voto particular disidente. El Juez Asociado señor Fuster Berlingeri concurre con el voto particular disidente de la Jueza Asociada señora Naveira de Rodón, por lo que disiente de la resolución mayoritaria. Los Jueces Asociados señores Rebollo López y Hernández Denton no intervinieron.

                                  Patricia Otón Olivieri
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Cooperativa de Consumidores
del Noroeste, Inc. y otros

    Demandantes Peticionarios

        v.                            CC-2002-944

Wal Mart Stores, Inc. y otros

    Demandados Recurridos

Voto particular disidente emitido por la Jueza Asociada señora NAVEIRA DE RODÓN

San Juan, Puerto Rico a 12 de junio de 2003

        Por las razones que a continuación exponemos, entendemos que la mayoría se ha equivocado al denegar la expedición del presente recurso en esta etapa de los procedimientos. El recurso de epígrafe plantea unas cuestiones de Derecho que somos de la opinión deben ser resueltas por este Foro antes de que el tribunal de instancia proceda a ver el caso en los méritos. La parte demandante peticionaria plantea que el Tribunal de Circuito de Apelaciones incidió:

> [A]l determinar que los Demandantes no tienen legitimación activa para presentar la Demanda objeto de este recurso. [Según su criterio, los] Artículos 13A y 5 de nuestra Ley no precluyen que se disputen mediante injunction tanto el aspecto anticompetitivo de la compra de Amigo por Wal-Mart como las demás prácticas anti-competitivas de Wal-Mart bajo los artículos 2 y 4 de la Ley Núm. 77.

Los demandantes exponen en el recurso que tienen derecho a presentar una solicitud de *injunction* para impugnar la compra de Supermercados Amigo (en adelante Amigo) por Wal Mart.

Como podrá observarse, el presente recurso nos permite, por primera vez, interpretar la interrelación entre los Arts. 2, 4, 5, 12 y 13A, de nuestra legislación antimonopolística, Ley Núm. 77 de 25 de junio de 1964, según enmendada, 10 L.P.R.A. secs. 257-276. También nos da la oportunidad de establecer cuál es la filosofía económica que quedó plasmada en dicha Ley y qué rol ésta le asigna al Estado y al sector privado en su implantación. Las directrices que emitamos servirían de guía, tanto al foro de instancia como a las partes, al ver el caso en su fondo, ya que les ayudarán a evaluar la pertinencia de la técnica y compleja evidencia que se requerirá para probar las alegaciones.

Nuestra legislación antimonopolística proviene principalmente de las leyes federales Sherman, Clayton, Robinson-Pattman y la ley que creó el Federal Trade

Commission (en adelante FTC).[1] Las que hoy nos conciernen son las disposiciones similares a las Leyes Sherman y Clayton, supra. Al interpretar nuestra legislación, resulta de suma importancia tener presente que del historial legislativo se desprende con meridiana claridad que nuestros legisladores estaban conscientes de las grandes diferencias existentes entre nuestro mercado y economía y el de Estados Unidos; y de lo nocivo que resultaría el tratar de transplantar a nuestra economía, sin modificar y atemperar, las leyes federales y su jurisprudencia. Su intención fue adoptar una ley que recogiera la filosofía de protección a la libre competencia, sin perder de vista que en Puerto Rico, por ser la nuestra una economía en vías de desarrollo, altamente reglamentada y dirigida, distinta por lo tanto a la de Estados Unidos, a veces resulta necesario brindarle a los comerciantes pequeños, medianos y grandes, protección contra los efectos de una agresiva competencia – no necesariamente una ilegal a tenor con la interpretación que a estos conceptos se les

---

[1] Ley Sherman, 15 U.S.C. secs. 1-7; Ley Clayton, 15 U.S.C. secs. 12-27 y 18 U.S.C. secs. 402, 660, 3285 y 3691; Ley Robinson-Pattman, 15 U.S.C. sec. 13; y la Ley de la Comisión Federal de Comercio (FTC), 15 U.S.C. secs. 41-57c. Ésta es la ley aplicable a las prácticas injustas y engañosas en el comercio ("unfair trade practices") y **no** es propiamente una legislación antimonopolística.

ha dado bajo la legislación federal.[2] Es por eso que en la exposición de motivos de la Ley Núm. 77, supra, se expresa que ésta se aprueba "para proteger al pueblo, asegurando a éste en general y **a los pequeños comerciantes, en particular, los beneficios de la libre competencia**".[3] En la exposición de motivos también se

---

[2]    La Ley Núm. 77, supra, en su Art. 19, contiene la siguiente cláusula de salvedad:

> El régimen legal de las empresas de servicio público, las compañías de seguros y de otras empresas o entidades sujetas a reglamentación especial por el gobierno del Estado Libre Asociado de Puerto Rico o por el gobierno de Estados Unidos, incluyendo las cooperativas, no será afectado por la presente ley, excepto a aquellos actos y contratos que no estén sujetos a la reglamentación del organismo público que gobierna las actividades de la empresa, entidad o cooperativa. **No obstante, ninguna fusión, adquisición de empresas existentes y en funcionamiento será aprobada por el organismo estatal correspondiente sin el previo asesoramiento del Secretario de Justicia.** (Énfasis suplido.)

[3]    Cónsono con esta filosofía, la Ley Núm. 77, supra, tiene una disposición específica para proteger las cadenas voluntarias de detallistas de bienes y servicios. El Art. 18 de la Ley, 10 L.P.R.A. sec. 274, lee así:

> No se considerará como violación a este capítulo el establecimiento de cadenas voluntarias de detallistas de bienes y servicios para establecer programas comunes, incluyendo negociaciones, compras y anuncios sobre precios, que lleven a cabo u organicen pequeños comerciantes dedicados al comercio al detal y proveedores de servicio y que posean cada uno hasta cinco (5) establecimientos comerciales, para unidos enfrentarse de buena fe a la competencia de establecimientos con volúmenes de ventas sustancialmente mayores, siempre que ninguna cadena voluntaria o

expresa que la Ley tiene como uno de sus propósitos el asegurarse que no germinen en Puerto Rico grandes concentraciones de poder económico, para que no nos corramos el riesgo de que toda la vida económica del país quede a merced de un grupo reducido de personas movidas sólo por un interés privado de lucro.

De un análisis del historial legislativo se puede colegir que fue la **intención del legislador que nuestra legislación se interpretase e implementase de forma autóctona**, tomando en consideración sus propósitos y las características y naturaleza muy particulares de nuestra economía, independientemente de que la legislación de donde proviene hubiese sido interpretada y aplicada de

---

programa común tienda a crear un monopolio, ni su efecto sea restringir sustancialmente los negocios, el comercio o la competencia o constituya un método injusto de competencia, así como una práctica o acto injusto o engañoso en los negocios o en el comercio.

Toda cadena voluntaria o persona común tendrá que ser reconocido por la Administración de Fomento Comercial. Ésta certificará que cumple con los requisitos de esta sección, previa solicitud a estos efectos, siempre que la existencia de ésta no tienda a crear un monopolio, restringir sustancialmente los negocios, el comercio o la competencia o constituya un método injusto de competencia, así como una práctica o acto injusto o engañoso en los negocios o en el comercio.

Véase además la Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. secs. 278-278e, que se discutió en la Legislatura conjuntamente con la Ley Núm. 77, supra, y se aprobó un día antes y que tiene el propósito de proteger a los distribuidores en Puerto Rico.

forma distinta por el gobierno y foro federal. Esto incluye el que nos apartásemos de la interpretación que se le hubiese dado a las legislaciones federales al momento en que se aprobó la Ley Núm. 77, supra, al igual que las interpretaciones posteriores, si éstas resultasen contrarias a los propósitos particulares de dicha Ley. La jurisprudencia federal, aunque de carácter persuasivo, siempre habrá que atemperarla a nuestras realidades económicas.

Es con estos principios en mente que debemos analizar la controversia en el caso de epígrafe. Ésta requiere que determinemos si a través de los Arts. 2 y 4, 10 L.P.R.A. secs. 258 y 260, una empresa o comerciante en el sector privado puede, al amparo del Art. 13A, 10 L.P.R.A. sec. 269a, impedir la adquisición o deshacer la adquisición ("divest") de una empresa competidora por otro competidor significativo del mercado, cuando alega que la adquisición es simplemente parte de un esquema estructurado con el propósito de restringir irrazonablemente los negocios o el comercio (Art. 2) e intentar monopolizar parte de los negocios o el comercio (Art. 4).[4] Como corolario de lo anterior,

---

[4] Hay que tener presente que el propósito de las prácticas monopolísticas es monopolizar, o sea, controlar el mercado y lo nocivo de estas prácticas es que una vez se eliminan los competidores más fuertes del mercado, entonces aumentan los precios y surgen otras prácticas indeseables que la competencia evita al existir por el potencial de perder mercado de los competidores que no incurren en las prácticas ilegales.

habrá que determinar si en virtud de lo dispuesto en los Arts. 5, 12, 13 y 13A, 10 L.P.R.A. secs. 261, 268, 269, y 269a, le corresponde exclusivamente al gobierno (E.L.A.) el poder de solicitar y obtener *injunctions* para paralizar o deshacer ("divest") fusiones y adquisiciones. Cabe señalar que se pueden hacer argumentos válidos y convincentes para apoyar cualesquiera de estas posiciones, por lo que resulta de suma importancia que este Tribunal paute la interpretación que guiará a los tribunales de instancia en esta importante área del quehacer comercial, que por su naturaleza puede tener impactos trascendentales y duraderos en nuestra economía.

Dados los hechos muy particulares del caso ante nos, también tendremos que auscultar qué efecto, si alguno, tiene el hecho de que la FTC ya le impartió su aprobación a la adquisición de Amigo por Wal Mart.[5]

Como podrá observarse, no cabe duda que antes de entrar a ver el caso en su fondo hay que resolver las cuestiones de Derecho planteadas. El presente caso, también nos permitirá auscultar qué impacto, si alguno, tiene sobre la aplicación de la Ley Núm. 77, supra, la transacción habida entre el Estado y Wal Mart, mediante la cual el Estado se comprometió a desistir con

_____

[5]  Fue con respecto a este punto legal que en el caso que el E.L.A. presentó en el foro federal se unieron varios Estados. Tendemos a creer que la actuación de la FTC no debe impedir que se pueda implantar la ley local.

perjuicio de impugnar la legalidad de la adquisición tanto en el foro federal como en el local.

Constan en el expediente unos documentos que se sometieron en sobre cerrado, marcados como "confidenciales por estipulación". De éstos surgen unos datos que entendemos deben tomarse en consideración en cualquier análisis que se haga en el caso de autos. Entre los documentos hay un plan bastante detallado de Wal Mart para la creación de lo que llama **"Neighborhood Markets"**, un concepto de mercadeo que podría tener un impacto significativo en el mercado de los colmados medianos y pequeños ("mom and pop stores") y, como bien apuntan los demandantes, podría hacer aún más difícil el nivel de entrada al mercado de supermercados en general en Puerto Rico. Como complemento a este plan de mercadeo, se menciona que Wal Mart tiene la intención de ir comprando o adquiriendo, según los arrendamientos vayan venciendo, los locales donde actualmente operan supermercados o colmados pequeños y medianos. Se menciona específicamente unos locales que hoy ocupa el Supermercado Pueblo. Tanto Wal Mart como los demandantes hacen hincapié en que uno de los factores más importantes que hay que considerar para penetrar efectivamente el mercado de supermercados en Puerto Rico es la escasez de terreno y locales disponibles para establecer este tipo de negocio.

De otra parte, del comunicado prensa que emitió la Secretaria de Justicia sobre la transacción a la cual llegó el Estado con Wal Mart para permitir la adquisición, se desprende con meridiana claridad que la preocupación del Estado y la de los comerciantes (demandantes) no es ni era la misma. El Estado aparentemente enfocó y dirigió las negociaciones hacia una transacción que evitase la pérdida de empleos o que éstos fuesen reducidos en categoría (de permanentes y a tiempo completo a temporeros y a tiempo parcial) y en lograr el mercadeo de productos locales (en y fuera de Puerto Rico) a través de la red de empresas de Wal Mart.

Los comerciantes locales (demandantes), a su vez, enfocan el problema estrictamente desde el punto de vista del efecto que esta adquisición tendrá en el mercado actual y futuro de supermercados en Puerto Rico (competencia actual y potencial). Aunque ambos fines, el del Estado y el de los comerciantes son importantes y loables, las medidas tomadas para lograrlos podrían resultar incompatibles. Resulta indispensable que este Tribunal se pronuncie sobre si la Ley Núm. 77, supra, se creó como un arma adicional del Estado para propulsar la política pública en áreas tangenciales a la de establecer y mantener una libre competencia en nuestros mercados. Para poder resolver este importante planteamiento de umbral, tenemos que interpretar cuál fue el esquema que el legislador quiso plasmar en la Ley

Núm. 77, <u>supra</u>. Nuestra economía no puede darse el lujo de la incertidumbre que crea la falta de directrices en un área tan vital.

Entendemos que este recurso reviste gran importancia y podría disipar dudas y ser la piedra angular para interpretaciones futuras. Requerirá que definamos con especificidad cuál es la filosofía económica que esboza y protege la Ley Núm. 77, <u>supra</u>, y hasta dónde puede el Estado utilizar dicha Ley para lograr otros propósitos, especialmente si el enfoque del Estado y los comerciantes para lograrlos difiere y se afecta o coarta el derecho de los comerciantes a defenderse efectivamente de prácticas monopolísticas que restringen irrazonablemente la competencia y tienden a crear un monopolio en el mercado donde operan.

En conclusión, somos del criterio que el recurso ante nuestra consideración nos brinda la oportunidad de interpretar las disposiciones de la Ley Núm. 77, <u>supra</u>, para que éstas formen un todo armónico, junto con las demás legislaciones que afectan e impactan de alguna forma las fuerzas del mercado, constituyendo así una parte importante del esquema estatutario creado por el Estado para fortalecer el crecimiento de nuestra economía. No podemos permitir que una legislación que se creó para proteger la libre competencia se convierta en una camisa de fuerza en contra precisamente de lo que se supone esté protegiendo.

Entendemos no sólo que el presente recurso se debe expedir, sino también que el Estado debe comparecer como *amicus curiae*, para así tener el beneficio de su posición en cuanto a cuál es precisamente el esquema que la ley establece y su posición, *vis à vis* la de los comerciantes del sector privado. Las actuaciones pasadas y futuras del Estado en esta vital área de la reglamentación económica, podrían depender de lo que en este caso resolviéramos.

Por las razones antes expuestas, disentimos de la mayoría. Expediríamos, en esta etapa de los procedimientos el recurso presentado, solicitaríamos la comparecencia del Estado y señalaríamos vista oral.


                              MIRIAM NAVEIRA DE RODÓN
                              Jueza Asociada